[Cite as *State v. Johnson*, 2013-Ohio-1961.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 12 CA 61 |
| WILLIAM JOHNSON | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:     Criminal Appeal from the Court of Common
                            Pleas, Case No.  2012 CR 134H


JUDGMENT:                    Affirmed in Part; Reversed in Part and
                            Remanded


DATE OF JUDGMENT ENTRY:     May 10, 2013


APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

JAMES J. MAYER, JR.                   PATRICIA O'DONNELL KITZLER
PROSECUTING ATTORNEY                  ANDERSON WILL O'DONNELL
JOHN C. NIEFT                         & KITZLER
ASSISTANT PROSECUTOR                  3 North Main Street
38 South Park Street                  Suite 801
Mansfield, Ohio  4402                 Mansfield, Ohio  44902

*Wise, J.*

{¶1}   Appellant William Johnson appeals his conviction and sentence entered in the Richland County Court of Common Pleas on one count of Abduction, one count of Aggravated Assault, and one count of misdemeanor Assault, following a jury trial.

{¶2}   Appellee is State of Ohio.

## STATEMENT OF THE FACTS AND CASE

{¶3}   Appellant William Johnson was indicted under two cases for events arising out of his relationship with Tomiko Mack. The two cases were consolidated for trial, which was held on June 11, 12, 14, 15, 18, 19, and 20, 2012.

{¶4}   The trial consisted largely of testimony of Tomiko Mack and competing testimony of Appellant.

{¶5}   At trial, Mack testified to the following:

{¶6}   Appellant and Mack met and began dating in 2009. (T. at 188). Appellant moved in with Mack at 855 McPherson, Mansfield, Ohio, shortly after they began dating. (T. at 191). The relationship was tumultuous and was punctuated by physical altercations. Mack recounted an uncharged offense which occurred in 2010 where Appellant choked her until she became unconscious. (T. at 192). On another occasion, Appellant beat Mack in the face, leaving her with a black eye. (T. at 192-193, 918).

{¶7}   In February, 2011, Mack asked Appellant to move out and to leave her car, which he had been using to travel to his classes and to visit his family. (T. at 194). When Appellant failed to do either, Mack and her sister Andrea moved Appellant's clothes to his mother's house in Akron on a day when Appellant was at school. (T. at 194-195).

{¶8} On February 28, 2011, after Appellant failed to return her car, Mack reported her vehicle stolen. (T. at 165-166, 198-199.)

{¶9} On March 2, 2011, Appellant was found and arrested at a rest area on I-71 in Mack's car. (T. at 199, 404-407).

First Incident - Mack

{¶10} Mack testified that on March 4, 2011, at approximately 11:00 p.m., she was returning home alone after patronizing a local bar with her sister, Andrea. (T. at 202, 320). She recounted that Appellant opened the garage door when she drove up and approached her with a "black, block-type object" pointed at her like a gun. (T. at 202, 208, 320). Appellant approached the car and the two of them "tussled." *Id.* Appellant then took her into the garage and told her to open the man-door into the house. *Id.* Mack stated that she was unable to open the door fast enough and Appellant kicked the door in. (T. at 203, 320). Appellant then forced Mack inside and choked her until she was unconscious. (T. at 205-210, 321).

{¶11} Mack testified she awoke to find tape covering her mouth and her hands bound with tape. *Id.* Appellant then forced her into her car and drove her to a Motel 6 near where she lived. (T. at 211, 321). Once inside the motel room, Appellant cut the bonds on Mack's wrists with a knife. (T. at 211). Appellant then began arguing with Mack about her fidelity and cut Mack's arm and poked her neck, shoulder, and chest with the knife. (T. at 213). Appellant then apologized and put the knife away. *Id.* Photographs were later taken of Mack's injuries from this incident, and she identified these photographs at trial. (T. at 214).

{¶12} After this, Mack drove Appellant back to his mother's house in Akron and then called the police. (T. at 217-225). Officers from Mansfield Police Department (MPD) searched the motel room and recovered a bed sheet with blood on it, which was tested for DNA. (T. at 419, 429,744). Dawn Fryback of the MPD Crime Laboratory testified she tested the DNA from the bed sheet. (T. at 744-745. The sheet tested positive for human blood and Mack was the source, with Appellant being excluded as a contributor. *Id.*

<u>Appellant</u>

{¶13} Appellant also testified about the events of the first incident. Appellant stated he had seen Mack a few times between his release from custody on March 2nd and March 4th. (T. at 849-853). Appellant testified that on March 4th, he was unable to get into Mack's house with his key. While he was trying, Mack arrived home with another man in her car. (T. at 853-855). Appellant became angry and attacked the other man, who then fled. *Id.* Appellant stated that Mack was drunk and was unable to open the side door, so Appellant kicked it in. (T. at 856). He stated that they both went into Mack's house without issue, but once inside Mack suddenly started punching at Appellant. (T. at 857). Appellant claimed he never struck Mack that night. (T. at 858). He said that Mack later calmed down and wanted to accompany Appellant to his hotel room. (T. at 859). Once they were at the hotel, they talked about infidelity and eventually engaged in consensual sex. (T. at 860). Appellant then recounted that after sex, Mack injured her arm attempting to open a wine bottle with a potato peeler. (T. at 861). The remainder of Appellant's testimony substantially matched Mack's regarding the first incident

Second Incident - Mack

**{¶14}** Mack testified that after the first incident, Appellant continued to contact her and she eventually forgave him. (T. at 232-233). However, she stated that she and Appellant did not date again when Appellant was released on bond from the charges of the first incident. (T. at 238-239).

**{¶15}** On February 15, 2012, Mack had dinner with Appellant to celebrate Valentine's Day and Mack's birthday. (T. at 239). After dinner, Mack drove Appellant to where he was staying, which was at one of his job sites, McCall's Auto Detailing. (T. at 243-244). She testified that once there, she and Appellant were talking and when Appellant went to hug her, he shocked her with a taser. (T. at 245-246, 355). She stated that they then "tussled" again and Appellant pulled out a small paring knife. (T. at 246, 358). Appellant then told Mack to get into the back seat or he would "gut [her] like a pig". (T. at 246-247, 360). Mack said that she complied and Appellant followed her into the backseat. *Id.* Appellant then took Mack's cell phone to search for evidence that Mack was cheating on him. Id. Mack stated Appellant poked her with the knife above her pubic area. (T. at 249, 359). Appellant threatened Mack by telling her there was a main artery was in her thigh. *Id.* Appellant then stabbed Mack in the neck and an altercation erupted between them. *Id.* During the altercation, Mack grabbed the knife blade with her hand, cutting it, and took the knife from Appellant. (T. at 249, 364-365). Mack stated that she then stabbed Appellant in the lip. *Id.* Appellant began choking Mack, but she did not pass out, so Appellant bound her hands and feet with duct tape. (T. at 249-251, 363). She recounted that these events occurred around 1:00 a.m. on

February 16th. (T. at 253). Mack's and Appellant's phones had been ringing, but went unanswered during this episode. (T. at 250).

{¶16} Mack, bleeding and bound in the back of her car, began agreeing with Appellant to keep herself alive. (T. at 254-255). Appellant contacted a friend to get a hotel room next to Joe's Bar in Mansfield so that he and Mack could get cleaned up and see to their injuries. (T. at 256-258, 364).

{¶17} Once they arrived at the hotel, Appellant's friend would not leave the room, so Appellant angrily drove the two of them to Akron. *Id.* Appellant drove around Akron because he was afraid the police would be at his mother's house. (T. at 259). Eventually, Appellant stopped at a pay phone, because both cell phones had died, and called his brother to ask him to let them into his mother's house. (T at 262). During the drive, Mack had managed to slip out of her bonds due to blood wetting the tape. (T. at 260). Upon arriving at Appellant's mother's house, Appellant warned Mack "don't try anything stupid, because I won't have a problem of killing you in front of my parents" (T. at 264).

{¶18} Appellant's brother, Leon, opened the side door and Appellant and Mack went into the basement of his mother's house. *Id.* There, both bandaged themselves and cleaned up. Appellant changed his clothes, leaving his bloodied clothes in the basement. (T. at 265-266). Mack testified that she was too afraid to attempt to flee. (T. at 267). Mack says she again went along with Appellant to keep safe. She suggested to Appellant that he take her to a motel so that they could work things out. (T. at 267). Appellant then drove Mack to a Motel 6 nearby. (T. at 268). As Appellant was about to turn into the parking lot, Mack found the box cutter in the back seat and she struck

Appellant multiple times near the temple. (T. at 269-270). Appellant stalled the car, turned in his seat, and started to fight with Mack. (T. at 270-271). Appellant became dazed, and Mack took the opportunity to flee into the hotel lobby vestibule. *Id.* The hotel employee called 911 and Mack spoke with the police. (T. at 273-274). Mack was permitted to wait in the locked portion of the hotel lobby, because it was 4:30 a.m. (T. at 273-275). The hotel security video confirmed Mack's entry into the lobby. (T. at 275). The hotel employee testified that Mack was bloody and panicked when she arrived. (T. at 483-488).

{¶19} Copley Police Department (CPD) Officer Darrell Garner responded first to the scene at 4:49 a.m. (T. at 628). He noted Mack's injuries, noting that some of her injuries appeared older and were no longer bleeding. (T. at 629-631). He also observed that Mack was gripping a box cutter and was not wearing shoes. (T. at 634-637). Mack gave a brief statement and then was transported to the local hospital. (T. at 275-280, 501-514). Mack was treated at the hospital and her injuries were photographed. (T. at 280-288, 530). Mack made multiple statements to officers and medical personnel, all consistent with her testimony at trial. (T. at 280-282, 284, 297, 506, 530-531, 631, 699.)

{¶20} When Mack ran into the hotel, Appellant fled. (T. at 632). Appellant was eventually arrested the following evening at the Motel 6 in Mansfield. (T. at 570, 586-591, 613- 618). In the hotel room the police found Mack's purse, including her ID and credit cards. (T. at 586- 591).

{¶21} The physician that treated Mack at Akron General Hospital testified to her injuries. Dr. Amir Shahideh stated that Mack had multiple abrasions and bruises to her face, choke marks on her neck and a stab wound on the right side of her neck. (T. at

701). Mack was also stabbed on her left wrist and had a small abrasion in her pubic region. *Id.* Dr. Shahideh stated that he was most concerned about the neck wound because it had the highest mortality rate and was bubbling, which was indicative of injury to the wind pipe or esophagus. (T. at 703-707). He also stated that the injuries were no more than four hours old. (T. at 711, 725). Dr. Shahideh identified photographs of Mack's injuries. (T. at 707- 710).

**{¶22}** The physical evidence collected from the second incident included the box cutter, Mack's clothing, a piece of duct tape recovered from Mack's clothing, and Appellant's clothing recovered from the basement of his mother's house. (T. at 748).

**{¶23}** Dawn Fryback testified that Mack was the major contributor and Appellant was a minor contributor of DNA from the handle of the box cutter. (T. at 748-750). From the blood on the box cutter, there was an even mixture of blood from which both Mack and Appellant were contributors. (T. at 750-751). The blood on Mack's shirt was from Mack alone. (T. at 751-752). The blood on Mack's jeans was hers, and a DNA mixture that did not include Appellant. (T. at 754-754). The blood found on the strip of duct tape was a mixture with Mack as the major contributor and Appellant as a minor contributor. (T. at 752-753). The blood found on Appellant's shirt had Mack as the major contributor and Appellant as the minor contributor. (T. at 755). Finally, Appellant was the only source for the blood on Appellant's jeans. *Id.*

### Appellant

**{¶24}** Appellant also testified about the second incident. Appellant's account of the events as to the birthday/Valentine's Day dinner on February 15th differed from that of Mack. According to Appellant, on or around 6:00 p.m., he and Mack went to Gary's

Discount where she bought him a stun gun as a Valentine's Day present. (T. at 877-878). The two then split up to take care of personal business, arriving separately at the restaurant for dinner at between 7:00 and 8:00 p.m. (T. at 878-879). After dinner, they drove together to Secrets bar so Appellant could work there. (T. at 881). Mack did not stay. Id. Appellant recalled that the bar was not busy, so he stepped outside to text "Sally," at which time "something busted [him] in the head." *Id.* He stated that he lost consciousness and woke up cut and bleeding at Mack's brother's house. (T. at 882, 932-933, 935). He testified that Mack's brothers were there and they were on the phone telling someone, "[w]e going to f**k him up." *Id.* Two of the brothers brandished knives at him. (T. at 939). Appellant says that he ran out the door and down a flight of steps, running into Mack on the street. (T. at 882-884). He stated that Mack freed his hand and gave him a ride in her car. (T. at 993-994). Appellant identified photographs of his injuries, cuts to face and hand/thumb. (T. at 883-884).

{¶25} Appellant further testified that he had Mack drive him to an area in Mansfield near a friend's house. (T. at 885). Appellant recounted that he blamed Mack for the situation and that he put his hand in Mack's face threateningly. (T. at 891- 892). Appellant explained that he had helped Mack's brother obtain cocaine to sell from a dealer he knew last year, and that dealer was later killed by Mack's brother in front of Mack and Appellant. (T. at 886- 889).

{¶26} Appellant testified that he and Mack got into an altercation in the car, which ended in Mack pulling a knife on him. (T. at 892). According to Appellant, he climbed on top of Mack and wrestled with her over the knife. As Mack maneuvered, she

stabbed herself in the neck and wrist. (T. at 892). He stated that things settled down and the night completed as testified to by Mack, but without any violence.

{¶27} Appellant stated that he tried to get a hotel in Mansfield with help from a friend, but that his friend refused to leave. (T. at 893- 894). Appellant says he and Mack then drove to Akron, ending up at his mother's house where they cleaned themselves up. (T. at 894-896). Appellant testified that Mack wanted to get a hotel room, so he drove her to a Motel 6 in Akron. (T. at 897-899). During the drive, Appellant confessed that he had slept with another woman, and Mack began attacking him with a box cutter. Appellant claims the assault ended with Mack running into Motel 6 and Appellant driving away. (T. at 898-900).

{¶28} Mansfield Police Department detectives took statements from Appellant. (T. at 1020-1024, 1033-1034). MPD detectives also investigated the kidnapping of Appellant by Mack's brothers the night of February 16th but failed to find any evidence. (T. 1026-1034, 1046).

{¶29} For the acts in the first incident, Appellant was indicted on one count of Aggravated Burglary, in violation of R.C. §2911.11(A)(1), a felony of the first degree, with a Firearm Specification pursuant to R.C. §2941.145 and a Repeat Violent Offender (RVO) Specification pursuant to R.C. §2941.149; one count of Kidnapping, in violation of R.C. §2905.01(A)(3), a felony of the first degree, with Firearm and RVO Specifications; and one count of Abduction, in violation of R.C. §2905.02(A)(1), a felony of the third degree, with Firearm and RVO Specifications.

{¶30} For the acts in the second incident, Appellant was indicted on one count of Felonious Assault, in violation of R.C. §2903.11(A)(2), a felony of the second degree;

one count of Attempted Murder, in violation of R.C. §2923.02(A), a felony of the first degree; one count of Abduction in violation of R.C. §2905.02(A)(1), a felony of the third degree; and two counts of Kidnapping, in violation of R.C. §2905.02(A)(3) and (A)(2), felonies of the first degree. Each offense had a RVO Specification.

{¶31} Appellant pled not guilty to both indictments, and they were combined for trial.

{¶32} On June 11, 2012, a jury trial commenced in this matter, lasting for seven days. At the conclusion of trial, following deliberations, the jury returned a verdict of not guilty on all counts in the first indictment.

{¶33} On the second indictment, Appellant was found guilty of Abduction and was also found guilty of the lesser included offenses of Felonious Assault: Aggravated Assault, in violation of R.C. §2903.12(A)(1), a felony of the fourth degree, and Assault in violation of R.C. §2903.12, a misdemeanor of the first degree.

{¶34} Appellant was found not guilty of all other counts in the second indictment.

{¶35} At sentencing, the trial court sentenced Appellant to the maximum sentence on all three counts. The trial court found that the RVO Specifications did not apply to these counts. The court ordered the sentences to run consecutive for the Abduction and Aggravated Assault convictions, for an aggregate sentence of 54 months, with three years of post release control.

{¶36} On October 31, 2012, the trial court issued a *nunc pro tunc* sentencing entry fixing two clerical errors. The first error the court fixed was marking that it considered the factors for consecutive sentencing pursuant to R.C. §2929.14(C)(4). The

second error the court fixed was to merge the allied offense of Assault into Aggravated Assault.

{¶37} Appellant now appeals to this Court, assigning the following errors for review:

**ASSIGNMENTS OF ERROR**

{¶38} "I. THE TRIAL COURT ABUSED ITS DISCRETION BY SENTENCING APPELLANT TO CONSECUTIVE SENTENCES WITHOUT MAKING CERTAIN FINDINGS REQUIRED BY RC. 2929.14.

{¶39} " II. APPELLANT'S CONVICTION FOR ABDUCTION IS CONTRARY TO THE MANIFEST WEIGHT AND SUFFICIENCY OF EVIDENCE PRESENTED AT TRIAL, THUS DENYING APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND UNDER SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION .

{¶40} "III. APPELLANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE U.S. AND OHIO CONSTITUTIONS WERE IMPERMISSIBLY VIOLATED BY THE STATE'S FAILURE TO COMPLY WITH THE DISCOVERY REQUIREMENTS OF CRIMINAL RULE 16(K).

{¶41} "IV.  APPELLANT WAS DEPRIVED OF A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND BY SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION DUE TO THE INEFFECTIVENESS OF TRIAL COUNSEL.

**{¶42}** "V. APPELLANT'S SENTENCE IS CONTRARY TO LAW, AS THE OFFENSES OF AGGRAVATED ASSAULT AND ASSAULT CONSTITUTE THE SAME OFFENSE AND THEREFORE SENTENCING ON EACH CHARGE RESULTS IN DOUBLE JEOPARDY AS PROHIBITED BY THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION AND SECTION 10 ARTICLE I OF THE OHIO CONSTITUTION; IN THE ALTERNATIVE, THE CHARGES ARE MERGEABLE ALLIED OFFENSES UNDER R.C. 2941.25."

**I.**

**{¶43}** In his First Assignment of Error, Appellant argues that the trial court erred in imposing consecutive sentences.  We agree.

**{¶44}** The law regarding consecutive sentences has recently changed. R.C. §2929.14, effective September 30, 2011, applies to this case.

**{¶45}** A court may impose consecutive sentences under R.C. §2929.14(C)(4) if it makes the following findings: (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender and (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) one of the following: (a) the offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense, or (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of

the courses of conduct adequately reflects the seriousness of the offender's conduct, or (c) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶46}** The amendment to the consecutive sentencing statute re-established the requirement that the sentencing judge make certain findings before imposing consecutive sentences. *See, e.g., State v. Wilson,* 8th Dist. No. 97657, 2012–Ohio–4153, ¶ 13 (court must again state its findings to support consecutive sentences at the sentencing hearing and in the judgment entry pursuant to the new statute, citing *State v. Comer,* 99 Ohio St.3d 463, 2003-Ohio-4165, paragraph one of the syllabus); *State v. Just,* 9th Dist. No. 12CA0002, 2012-Ohio-4094, ¶ 48–49 (court need not explain its reasons for making the consecutive sentencing findings, as the new statute does not require it); *State v. Stalnaker,* 11th Dist. No. 2011-L-151, 2012-Ohio-3028, ¶ 15 (trial court must again state the required findings on the record to impose consecutive sentences, but not its reasons supporting those findings).

**{¶47}** While the new sentencing code requires the trial court to make findings to support consecutive sentences, it does not require the court to give reasons in support of those findings.

**{¶48}** Upon review of the record, we find the trial court, in its July 2, 2012, Sentencing Entry, failed to make the findings required by R.C. 2929.14(C)(4).

**{¶49}** The trial court filed a Nunc Pro Tunc sentencing entry on October 31, 2012.

**{¶50}** A trial court has authority to correct clerical errors in its judgments. Crim.R. 36. "Although trial courts generally lack authority to reconsider their own valid final

judgments in criminal cases, they retain continuing jurisdiction to correct clerical errors in judgments by nunc pro tunc entry to reflect what the court actually decided. *State ex rel. Cruzado v. Zaleski,* 111 Ohio St.3d 353, 2006–Ohio–5795, 856 N .E.2d 263, ¶ 18–19; Crim.R. 36." *State ex rel. Womack v. Marsh,* 128 Ohio St.3d 303, 2011-Ohio-229.

**{¶51}** The October 31, 2012, Sentencing Entry, included the trial court's findings in support of consecutive sentences pursuant to R.C. §2929.14(C)(4).

**{¶52}** Unfortunately, the trial court issued its *nunc pro tunc* entry after the notice of appeal was filed. A trial court does not have jurisdiction to amend its judgment entries after a notice of appeal has been filed. "Although a court generally may issue a nunc pro tunc entry any time * * * a notice of appeal divests a trial court of jurisdiction to do so." (Footnote omitted.) *State v. Smith,* 2d Dist. No. 2010–CA–63, 2011–Ohio–5986, ¶ 7; *see, also State v. Biondo,* 11th Dist. No. 2009–P–0009, 2009–Ohio–7005, ¶ 18; *State v. Erlandsen,* 3d Dist. No. 1–02–46, 2002–Ohio–4884; *State v. Reid,* 6th Dist. No. L–97–1150, 1998 WL 636789 (Sept. 18, 1998).

**{¶53}** We therefore sustain Appellant's First Assignment of Error and remand the case to the trial court so that it may issue another *nunc pro tunc* entry correcting the judgment entry to include its findings in support of consecutive sentences.

**V.**

**{¶54}** For ease of discussion, we are addressing Appellant's assignments of error out of order.

**{¶55}** In his Fifth Assignment of Error, Appellant argues that his sentences for aggravated assault and assault were allied offense of similar import and should therefore have been merged.  We agree.

**{¶56}** R.C. §2941.25 defines allied offenses of similar import as follows:

**{¶57}** "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

**{¶58}** "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

**{¶59}** Recently, the Ohio Supreme Court addressed the issue raised herein in *State v. Johnson,* 2010-Ohio-6314, holding,

**{¶60}** "Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

**{¶61}** "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. *Blankenship,* 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ('It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses.' [Emphasis sic] ). If the offenses correspond

to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

**{¶62}** "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' *Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

**{¶63}** "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

**{¶64}** "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R .C. 2941.25(B), the offenses will not merge."

**{¶65}** In the case sub judice, as admitted by the State, the offenses in this case were alternatives to the same offense, which could not have been committed with separate acts or animus.

**{¶66}** The trial court failed to include the merger of the offenses in its original sentencing entry but then corrected such omission in its Nunc Pro Tunc sentencing entry.

**{¶67}** Again, as set forth above, because the trial court filed its Nunc Pro Tunc entry after the filing of the Notice of Appeal in this matter, we must sustain his Fifth Assignment of Error and remand this matter to the trial court for re-sentencing.

**II.**

{¶68}  In his Second Assignment of Error, Appellant claims that his conviction for abduction was against the manifest weight and sufficiency of the evidence.   We disagree.

{¶69}  In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶70} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶71}  In the instant case, Appellant was convicted abduction:

{¶72}  The elements of abduction are set forth in R.C. §2905.02(A)(1), which provides in pertinent part:

{¶73}  "(A) No person, without privilege to do so, shall knowingly do any of the following:

**{¶74}** (1) By force or threat, remove another from the place where the other person is found;"

**{¶75}** Based on the testimony of Tomiko Mack, as set forth in detail above in the recitation of the facts, the jury in this case could have reasonably concluded that Appellant removed her from the place where he found her.

**{¶76}** Appellant's own testimony regarding the events in question presented the jury with sufficient evidence to find Appellant had committed such crime.

**{¶77}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Appellant had committed the crime of abduction We hold, therefore, that the state met its burden of production regarding each element of the crime and, accordingly, there was sufficient evidence to support Appellant's conviction.

**{¶78}** "A fundamental premise of our criminal trial system is that 'the *jury* is the lie detector.' *United States v. Barnard,* 490 F.2d 907, 912 (C.A.9 1973) (emphasis added), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 724-725, 35 L.Ed. 371 (1891)". *United States v. Scheffer* (1997), 523 U.S. 303, 313, 118 S.Ct. 1261, 1266-1267, 140 L.Ed.2d 413.

**{¶79}** Appellant cross-examined the State's witness and further put on his own witnesses in an attempt to rebut the State's case.

**{¶80}** The weight to be given to the evidence and the credibility of the witnesses are issues for the Trier of fact. *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, certiorari denied (1990), 498 U.S. 881, 111 S.Ct. 228, 112 L.Ed.2d 183.

**{¶81}** The jury was free to accept or reject any and all of the evidence offered by Appellant and the State and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP739, citing *State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09-1236 Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver,* Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing *State v. Antill* (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548; *State v. Burke,* Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

**{¶82}** After reviewing the evidence, we cannot say that this is one of the exceptional cases where the evidence weighs heavily against the convictions. The jury did not create a manifest injustice by concluding that Appellant was guilty of the crimes charged in the indictment. The jury heard the witnesses, evaluated the evidence, and was convinced of Appellant's guilt.

**{¶83}** We conclude the Trier of fact, in resolving the conflicts in the evidence, did not create a manifest injustice requiring a new trial.

**{¶84}** Based on the foregoing, we find Appellant's Second Assignment of Error not well-taken and hereby overrule same.

### III.

**{¶85}** In his third assignment of error, Appellant argues that the State failed to comply with Crim.R. 16(K), thereby depriving him of his right to due process and a fair trial. We disagree.

**{¶86}** Crim.R. 16(K) states as follows:

**{¶87}** "An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial."

**{¶88}** Appellant argues the State's witnesses, Dawn Fryback and Amir Shahideh, MD, testified as experts but Appellant was never given proper notice.

**{¶89}** Upon review, we are not persuaded that Dr. Shahideh was actually testifying as an expert. "It is well established that treating physicians can be called at trial to testify as viewers of their patients' physical condition and not as experts retained in anticipation of litigation." *Henry v. Richardson,* 193 Ohio App.3d 375, 951 N.E.2d 1123, 2011–Ohio–2098, ¶ 33, citing *Fischer v. Dairy Mart Convenience Stores, Inc.* (1991), 77 Ohio App.3d 543, 602 N.E.2d 1204. Even if we assume *arguendo* that Dr. Shahideh had been functioning as an expert witness, we have recognized that Crim.R.

16(K) is subject to a "harmless error" analysis. *See State v. Lewers,* Stark App.No. 2009–CA–00289, 2010–Ohio–5336, ¶ 125–¶ 128. In the case sub judice, particularly in light of Mack's and Appellant's own testimony, we would find the lack of Dr. Shahideh's formal report to be harmless beyond a reasonable doubt.

{¶90} Upon review of the testimony of Dawn Fryback from the crime lab, we do not find her testimony as to the presence of DNA on Appellant's shirt, Mack's pants and the strip of duct tape was prejudicial to Appellant because Appellant's own testimony supported the presence of DNA on these items.

{¶91} Further, we note that Appellant has waived this issue as he failed to raise any alleged discovery violations prior to or during the trial in this matter. Further, upon review of the transcript, we find Appellant failed to object to the qualifications and/or testimony of either witness.

{¶92} Appellant's Third Assignment of Error is overruled.

## IV.

{¶93} In his Fourth Assignment of Error, Appellant argues that he was denied the effective assistance of counsel. We disagree.

{¶94} More specifically, Appellant claims that his counsel was ineffective for failing to object to the introduction of expert witnesses Dawn Fryback and D. Amir Shahideh, and further for failure to request merger of the assault charge into the aggravated assault charge.

{¶95} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's

essential duties to Appellant. The second prong is whether Appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell* (1993), 506 U.S. 364, 113 S.Ct. 838, 122 L .Ed.2d 180; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

**{¶96}** In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Bradley,* 42 Ohio St.3d at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. *Id.*

**{¶97}** In order to warrant a reversal, Appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial; a trial whose result is reliable. *Strickland* 466 U.S. at 687, 694, 104 S.Ct. at 2064; 2068. The burden is upon the defendant to demonstrate that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.; Bradley,* supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland, supra*; *Bradley, supra*.

**{¶98}** Having found Appellant's argument as to testimony of Dawn Fryback and Dr. Shahideh is without merit, we do not find Appellant's defense counsel's performance was deficient for failing to object to same.

**{¶99}** Appellant also argues that his counsel was ineffective for failing to argue that the charges of assault and aggravated assault should have been merged. As set

forth in our analysis of Appellant's Fifth Assignment of Error, the trial court did in fact merge Appellant's sentences for these two offenses and ran the sentences concurrently.  The trial court failed to include the merger language in its original sentencing entry and attempted to correct this error in its nunc pro tunc sentencing entry. Upon remand for resentencing, this error will be corrected with the new nunc pro tunc sentencing entry.

{¶100} Based on the foregoing, we do not find Appellant's trial counsel was ineffective.

{¶101} Appellant's Fourth Assignment of Error is overruled.

{¶102} Accordingly the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed in part, reversed in part, and remanded for further proceedings consistent with the law and this opinion.

By: Wise, J.

Hoffman, P. J., and

Baldwin, J., concur.

_____

_____

_____

JUDGES

JWW/d 0422

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


STATE OF OHIO                            :
                                         :
    Plaintiff-Appellee               :
                                         :
-vs-                                     :          JUDGMENT ENTRY
                                         :
WILLIAM JOHNSON                          :
                                         :
    Defendant-Appellant              :          Case No. 12 CA 61


For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

Costs to be split evenly between the parties.


_____

_____

_____

                    JUDGES